# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 2:12-cr-00501-DCN-1 |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| DOMINICK MALICK MAYES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter comes before the court on defendant's motion to suppress a firearm and statements made after discovery of the firearm. Because this evidence was obtained by a private security guard acting in a private rather than governmental capacity, and the constitutional protections Mayes relies upon do not apply to "searches by privates individuals acting in a private capacity," United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003), the court denies defendant's motion.

## I.  BACKGROUND

On June 14, 2012, the Grand Jury indicted defendant Dominick Malick Mayes on one count of knowingly possessing a firearm as a convicted felon. The indictment stems from the seizure of a firearm on Easter Sunday at a racetrack in Dorchester County, South Carolina. On December 27, 2012, the court held a hearing on Mayes's motion to suppress. The following facts are drawn from the credible and uncontroverted testimony provided at the hearing.

On the evening of April 8, 2012, Kevin Johnson was working as a security guard at the racetrack in Dorchester County. He was employed by South Carolina Security Agency, a privately-owned business providing security services. Mr. Johnson's duties

1

were primarily centered on safety and crime deterrence: he was supposed to "walk around and make sure nobody was fighting, smoking [marijuana], or doing anything of that nature," "keep people from crossing over the track," and "keep people from getting hit" by debris from the racetrack. Mr. Johnson would intervene when coming upon an illegal or dangerous situation, and, if necessary, reach out to any law enforcement officers that might be present at the time. Deputies from the Dorchester Country Sheriff's Office were also stationed at the racetrack on April 8, 2012.

During an intermission between races, Mr. Johnson went to use the bathroom. Along the way, a man leaving the bathroom told Mr. Johnson that someone in the bathroom had dropped a gun. When Mayes exited the bathroom, the tipster pointed to him as the man in possession of the gun, stating "that's the guy that had the gun on him." So as not to alarm the crowd near the bathroom,[1] Mr. Johnson walked by Mayes and intentionally gave him a "shoulder bump," allowing him to feel a gun in Mayes's front waistband. Based on his experience searching for weapons at night clubs, Mr. Johnson felt what he believed to be an automatic. He proceeded to move Mayes away from the bathroom, search him, secure the loaded gun,[2] and place Mayes in handcuffs.

Once Mayes was cuffed, Mr. Johnson began walking him towards the deputies from the Dorchester Country Sheriff's Office. Mayes attempted to get out of his predicament by offering bribe money to Mr. Johnson, which Mr. Johnson declined. Mr. Johnson then asked Mayes why he was carrying a gun, and Mayes responded that he had been in a previous altercation at the racetrack and needed to carry the gun to protect

---

[1] The testimony indicates that there was a large crowd near the bathroom and several children were present.

[2] The Dorchester County Sheriff's Office removed eight rounds from the firearm.

2

himself.[3] When Mr. Johnson reached the deputies, he handed over Mayes's gun. The deputies then replaced Mr. Johnson's handcuffs with their own and placed Mayes in a squad car.

The deputies from the Dorchester County Sheriff's Office who were present on the evening of April 8, 2012 knew that at least ten private security officers were also present. According to the sheriff's deputies, they knew that the private security officers worked for "a separate entity" independent of the Sheriff's Office. When Mr. Johnson brought Mayes to the deputies, they took custody of him. At no point before or after Mr. Johnson arrived with Mayes did the deputies instruct Mr. Johnson on what he was supposed to do while working at the racetrack. In fact, a deputy testified that the Sheriff's Office "really had no interaction with [the private security officers] other than when they assumed certain spots or areas on the track," during which the deputies "would leave that particular area and go do our duties somewhere else."

## II.  DISCUSSION

Mayes brings a motion to suppress, arguing that Mr. Johnson's actions violated his Fourth and Fifth Amendment rights.[4] The government contends the evidence was obtained from Mayes when Mr. Johnson was working in a purely private capacity, so there was no constitutional infringement. Even if Mr. Johnson were acting in a governmental capacity, the government argues the search and seizure was constitutional. The court takes these issues in turn.

---

[3] According to Mr. Johnson, Mayes stated that his intention that night was to shoot a man who had previously assaulted him. See Hr'g Tr., Dec. 27, 2012, 11:1-5 ("[H]e said, um, he had got into an altercation with a guy prior, like two to three weeks before coming out there, and he said the guy jumped on him and beat him bad, so he said he seen the guy out there he said he's going to shoot him.").

[4] Mayes also asserts that his Sixth Amendment rights were violated, but the court finds Mayes has not alleged any specific Sixth Amendment violation.

### A. Whether Mr. Johnson Was a State Actor

In general, the protections from abuses of authority in the Fourth and Fifth Amendments only apply to governmental conduct.  See Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. 602, 614 (1989) ("[T]he Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative."); Colorado v. Connelly, 479 U.S. 157, 170 (1986) ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.").  When actions taken by private individuals are challenged as unconstitutional, the critical question is whether the individuals acted as "instruments or agents of the Government."[5]  Jarrett, 338 F.3d at 344 (internal quotation marks and alterations omitted); see Coolidge v. New Hampsire, 403 U.S. 443, 487 (1971) (stating the question as whether a private individual, "in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state").

"[R]egardless of whether the Fourth or Fifth Amendment is at issue," courts in the Fourth Circuit "apply the same test to determine whether a private individual acted as a Government agent."  United States v. Day, 591 F.3d 679, 683 (4th Cir. 2010).  "The defendant bears the burden of proving that an agency relationship exists" between the government and private individual.  Jarrett, 338 F.3d at 344.  To make this determination, courts look to "two primary factors":  "(1) whether the Government knew of and acquiesced in the private individual's challenged conduct; and (2) whether the private

---

[5] Similarly, "[18 U.S.C. §] 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law." Romanski v. Detroit Entm't, L.L.C., 428 F.3d 629, 636 (6th Cir. 2005).  A private actor acts under color of state law when its conduct is "fairly attributable to the state." Lugar v. Edmondson Oil Co., 457 U.S. 922, 947 (1982).

individual intended to assist law enforcement or had some other independent motivation." Day, 591 F.3d at 683 (internal quotation marks omitted).

### 1. Whether the Government Knew of and Acquiesced in Mr. Johnson's Conduct

Under the first factor, the Fourth Circuit has stated that "there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional." Jarrett, 338 F.3d at 346; see id. at 345 ("In seeking to give content to this factor, we have required evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship.").

#### a. United States v. Day

This case is controlled by the Fourth Circuit's decision in United States v. Day, 591 F.3d 679 (4th Cir. 2010).[6] In that case, two private, armed security officers were on duty at an apartment complex. United States v. Day, 590 F. Supp. 2d 796, 799 (E.D. Va. 2008), rev'd, 591 F.3d 679 (4th Cir. 2010). Shortly after midnight, they observed the defendant, Day, and another individual standing in the middle of the road and arguing with occupants inside an apartment. The officers observed Day pull a firearm from a nearby car and then advance on the apartment while shouting at the occupants. Exiting their patrol car, the officers drew their weapons, yelled at Day to freeze, and placed him in restraints. Prior to being given a Miranda warning, Day admitted he had marijuana in

---

[6] The question in this case of whether Mr. Johnson acted as an agent of the government such that he became a government actor is a question of federal, rather than state, law. Therefore, the court looks to federal case law to decide this issue. Cf. Clackamas Cty. v. Midwest Emp'rs Cas. Co., No. 07-780, 2009 WL 4916364, at *7 (D. Or. Dec. 14, 2009) ("[W]hether an individual qualifies as a state actor for purposes of § 1983 is a question of federal law."). Still, a "factor relevant to the state actor determination is how the state itself views the entity," so the court will look to South Carolina case law when appropriate. Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 347 (4th Cir. 2000).

his pocket, which one of the officers seized along with the firearm. Day also answered questions about the firearm. The officers then contacted the local police department, which took custody of Day. Id.

### b. The District Court's Decision

Day moved the district court to suppress his statements concerning the marijuana and firearm. The threshold question for the court was whether the security officers were acting as government agents in their interactions with Day. To answer this question, the court looked to the extent of the Commonwealth of Virginia's regulation of private security officers. The court found, "Importantly, Virginia Code Section 9.1-146 endows these registered armed security officers with 'the power to effect an arrest for an offense occurring . . . in his presence on [the] premises' wherein the officer is on duty." Id. at 800 (quoting Va. Code Ann. § 9.1-146). This grant of power to effect an arrest was "enough" to find that the state, through its regulations, affirmatively encouraged the actions taken by the security officers, making them government actors. Id. at 801-02. The court additionally found it persuasive that to be an armed security officer in Virginia, one must obtain valid government registration, satisfy minimum compulsory training standards established by a government entity, and pass a government background check. See id. at 800 (citing Va. Code Ann. § 9.1-139 & 9.1-139(F)). In addition, registered security officers remain subject to investigation and discipline by the government. Id. (citing Va. Code Ann. § 9.1-141). This registration scheme led the court to conclude that "the state was the genesis of [the officers'] power and activities rather than a mere passive recipient of the largess of their actions," therefore, the officers acted as government agents. Id. at 802.

The district court was also persuaded that, under a § 1983 analysis, the security officers would be found to have acted under color of state law based on the "public function test": "Where private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test." Romanski v. Detroit Entm't, L.L.C., 428 F.3d 629, 637 (6th Cir. 2005). A decision issued by the Virginia Court of Appeals, Coston v. Virginia, 512 S.E.2d 158, 159 (Va. Ct. App. 1999), had interpreted the grant of arrest authority to armed security officers in Virginia Code Ann. § 9.1-146. That court stated, "Through *substantial regulation*, the General Assembly has clothed registered security officers with many of the powers reserved for public employees or officers. Indeed, in some instances, a security officer is treated exactly like a police officer." Id. (emphasis added). Based in part on this language, the district court determined that the private security officers' enjoyment of arrest power qualified them as *de facto* police officers, and thus, state actors, under the public function test.[7]

For all of these reasons, the court held that the security officers were state actors. The court then held that Day's constitutional rights were violated and suppressed certain evidence seized by the officers.

### c. The Fourth Circuit's Decision

The Fourth Circuit reversed. The majority began by noting that the defendant bears the burden of proving the existence of an agency relationship, and the ultimate

---

[7] The district court also observed that the officers were "patrolling" in an unmarked sedan "of sufficient similarity to . . . [an] unmarked police car"; that they drew their weapons and yelled at Day to "freeze"; and that they were wearing black uniforms, displaying gold badges, and bearing handguns. Id. at 802. All of this, the district court found, rendered the security officers "the quintessential image of law enforcement," which militated towards a finding that the officers were *de facto* police officers. Id.

7

determination "turns on the degree of the Government's participation in the private party's activities," a "question that can only be resolved in light of all the circumstances." Day, 591 F.3d at 683 (internal quotation marks omitted).

Under the first factor of the agency test—whether the government "knew of and acquiesced in" the challenged conduct of the security officers by participating in or encouraging the conduct—the Fourth Circuit found that Virginia's regulatory scheme did not "affirmatively encourage" the security officers to arrest Day. Id. at 685. Instead, the officers "were simply empowered by the Commonwealth to make an arrest." Id. Unlike in cases where the government takes more than a passive position towards the underlying private conduct and makes its preference regarding the actions of private individuals known, see Skinner, 489 U.S. at 614-15, Day presented "'the more usual situation in which the government merely knows of or acquiesces in a private person's [conduct], whose fruits (*e.g.*, drugs or a confession) are then appropriated by the government for its own purposes.'" Day, 591 F.3d at 685 n.6 (quoting Presley v. City of Charlottesville, 464 F.3d 480, 488 n.7 (4th Cir. 2006)).

In reaching this conclusion, the Fourth Circuit was persuaded that nothing in Virginia's regulatory scheme suggested the security officers would "expect some benefit [or] reward from the government" by making an arrest, or "expect some detriment" such as "getting in trouble with government authorities [by] not acting." Id. at 685. For example, while Virginia Code Ann. § 9.1-141(C)(6) subjects security officers to governmental discipline in certain circumstances, nothing in the record indicated the government would have so disciplined the officers for failing to arrest Day. See id.

Testimony given by the security guards also showed the absence of governmental encouragement or participation in their conduct. One of the security guards testified that he had never received any directives from a law enforcement agency concerning his work at the apartment complex, nor had the local police department given specific instructions regarding Day. The security guard did not expect to receive any reward from any state entity for his actions. Id. at 686. In addition, a local police officer testified he had never directed the activities of the private security guards at the apartment complex, much less interacted with them. Id.

Finally, the court considered, and rejected, the district court's conclusion that under the public function test employed in § 1983 cases, the security guards acted as *de facto* police officers. The court noted that police officers in Virginia can arrest any person they have at least reasonable suspicion to believe committed a felony, whether or not the person is in their presence. Id. at 688 (citing Va. Code Ann. § 19.2-81). On the contrary, a private security officer can only effect an arrest for an offense occurring "in his presence." Id. (citing Va. Code Ann. § 9.1-146). Thus, the powers given to armed security officers are "more circumscribed than that of police officers," and are "also essentially the same as that of any private citizen." Id. at 689. For this reason, the security officers were not *de facto* policemen.

In sum, the court determined that Day did not meet his burden of proving the existence of an agency relationship between the government and the private security guards under the first factor of the agency test, and ultimately reversed the judgment of the district court.

### d. Analysis

In this case, Mayes relies primarily on the argument that South Carolina's regulatory system renders private security guards state actors. Mayes also emphasizes that Mr. Johnson received a training certification issued by the South Carolina Law Enforcement Division (SLED) to evince his governmental authority.

Under the South Carolina Private Detective and Private Security Agency Act (the Act), "A person who is registered or licensed under this chapter and who is hired or employed to provide security services on specific property is granted the authority and arrest power given to sheriff's deputies." S.C. Code Ann. § 40-18-110. The private security guard "may" arrest a person violating or charged with violating a state criminal statute, but "only on the property on which he is employed." Id.[8] SLED has various powers and duties relating to the practice of private security, including licensing of security business and registration of officers, id. §§ 40-18-30(A)(1), 40-18-60, training and certification, id. § 40-18-30(A)(5), fingerprinting, id. § 40-18-30(D), and granting weapons permits, id. § 40-18-100(A). SLED also has the power to investigate alleged violations of the Act and of its own regulations, and can suspend or revoke licenses and registrations under the Act. See id. §§ 40-18-30(A)(3), 40-18-130(A).

The Fourth Circuit has noted that the Act "merely establishes a licensing scheme," in that it "addresses the manner of applying for a license, bonds, fees, registration of employees, firearms permits, the police powers of licensees, and the

---

[8] An Attorney General's opinion interpreting a prior version of this section stated that "[g]iven the wording of the Act itself, plus the legislative intent manifested thereby," the authority of private officers is "strictly confined" to the property on which they are employed, and "[t]he authority of [such] officers to pursue and/or arrest offenders outside that property would be no greater or less than that of private citizens." S.C. Op. Atty. Gen. No. 77-203, 1977 WL 24545 (1977).

suspension or revocation of license." Rabon v. Guardsmark, Inc., 571 F.2d 1277, 1281 (4th Cir. 1978) (declining to extend a higher standard of care to private security agencies than the ordinary negligence standard with respect to liability to the public for unauthorized acts of their security guards). Other courts have called the Act a "system of intensive regulation." Thompson v. McCoy, 425 F. Supp. 407, 409 (D.S.C. 1976). In Thompson, the question was whether the Act bestowed the necessary authority upon a private security guard such that his actions were "under color of state law" with regards to § 1983. The court found "the most important feature of the Act as it relates to state action, is [former S.C. Code Ann. § 40-17-130],[9] which clothes state-approved private security guards with the authority and power which sheriffs have to make arrests of any persons violating or charged with violating any of the criminal statutes of this state, while on the employer's premises." Id. at 409 (internal quotation marks and footnote omitted). The court held that actions under the Act's system of regulation, combined with the statutory grant of police authority, reached "the necessary degree of state control and cooperation to be properly characterized as action taken 'under color of state law.'" Id.

As Mayes's cogent and well-written brief points out, courts have found the Act to extensively regulate the actions of private security officers. However, the Act does not go so far as to render the officers *de facto* police in all cases. In fact, the powers of private security officers are circumscribed in many ways, when compared to the powers of police officers. Opinions issued by the South Carolina Attorney General have advised that private security officers licensed by SLED do not have the power to engage in "hot pursuit" of offenders away from the private property they are assigned to guard, S.C. Op. Atty. Gen. No. 87-73 (1987), 1987 WL 245481; they may not carry firearms into

---

[9] Section 40-17-130 has been revised and is now codified at § 40-18-110.

11

establishments they are not hired to guard, S.C. Op. Atty. Gen. No. 4348 (1976), 1976 WL 22967; they may not operate a vehicle equipped with a siren and flashing blue or red lights, S.C. Op. Atty. Gen. No. 80-20, at *4 (1980), 1980 WL 81904; and they lack the authority to investigate crimes, even on the property on which they are employed, id. at *1.  One such opinion states, "The South Carolina Detective and Private Security Agency Act does not raise the private security guard to the level of that of a public law enforcement official."  S.C. Op. Atty. Gen. No. 80-20, at *2.

The district court in Day noted that Virginia's regulatory scheme grants security officers the power to effect arrests for offenses occurring on the premises wherein the officer is on duty, and found that to be "enough" evidence that the state scheme rendered the officers state actors.  Day, 90 F. Supp. 2d at 800-02 (citing Va. Code Ann. § 9.1-146). The Virginia Code also mandates that a registered armed security officer be considered an "arresting officer" in certain circumstances.  See Va. Code Ann. § 9.1-146.  A Virginia Court of Appeals decision has even stated that the Virginia General Assembly had substantially regulated private security officers.  Coston, 512 S.E.2d at 159. Nevertheless, the Fourth Circuit gave short shrift to the argument that the registration scheme alone transformed the private security guards into state actors.  The regulations "merely permitted" the officers to arrest Day but "did not require or even encourage" the complained-of action.  Day, 591 F.3d at 685.[10]

Similarly here, the Act authorizes private security officers in South Carolina to make arrests on the property on which they are guarding, S.C. Code Ann. § 40-18-110, but "d[oes] not require or even encourage an arrest or any other complained-of action."

---

[10] The Fourth Circuit's analysis shows that the pervasiveness of a registration scheme can only, in and of itself, transform a private individual's actions into state actions in narrow circumstances.

12

Id. While some decisions in this state find the Act's regulatory scheme to be "intensive," Thompson, 425 F. Supp. at 409, the South Carolina Code does not suggest that Mr. Johnson would have expected a benefit or reward from the government by arresting Mayes, or that he would have expected a detriment such as "'getting in trouble with government authorities'" from not acting. Id. (quoting United States v. Shahid, 117 F.3d 322, 323 (7th Cir. 1997)). The relevant regulations in South Carolina did not "affirmatively encourage" Mr. Johnson to arrest Mayes, but simply empowered him to make the arrest. In addition, Mr. Johnson's SLED-issued training certification only mirrors the authority provided by statute. For these reasons, there is a marked absence of "active participation or encouragement" by the government sufficient to implicate the Fourth and Fifth Amendments.

Testimony provided by Mr. Johnson bolsters this conclusion. The focus of the state actor inquiry is whether an agency relationship exists based on the government's encouragement or participation in the challenged conduct, and the analysis is guided by common law principles of agency. See Jarrett, 338 F.3d at 344. There is no evidence that Mr. Johnson was working at the behest or direction of the Dorchester County Sheriff's Office. While the deputies knew of Mr. Johnson's presence at the racetrack, they gave him no instructions; to the contrary, Mr. Johnson's duties came from his private employer. Mr. Johnson testified,

> Q: [D]oes the Dorchester County Sheriff's Office pay you for your work there at the racetrack?
> A: No.
> Q: Do they instruct you on what to do?
> A: No.
> . . . .
> Q: Would you consider it a part of your duties as a private security guard to address a situation where somebody had a firearm?

> A:      Yes.
> . . . .
> Q:      Now, when you were first told by this, this stranger that there was a man that the stranger had seen in the bathroom with a gun, did you confer with anybody with the sheriff's department as to what to do about that?
> A:      No.

In Day, "no law enforcement agency had ever given [the private security guard] any directives concerning his work," and the guard "had received no instructions from the . . . police department . . . and expected no reward from the police department for his actions." 591 F.3d at 686. Similarly here, Mayes concedes that the search was not conducted at the direction of local police. Even under ordinary agency principles, Mr. Johnson would not qualify as an agent of the state. See Tate v. Mauldin, 154 S.E. 431, 435-36 (S.C. 1930) (the master must direct the operations of the servant, and the servant must carry on the business of the master, for an agency relationship to be created).

Finally, it is important to note that in Day, the private officers looked, talked, and walked like police officers, according to the district court.[11] See Day, 590 F. Supp. 2d at 802 (observing that the officers were "patrolling" in an unmarked sedan "of sufficient similarity to . . . [an] unmarked police car"; that they drew their weapons and yelled at Day to "freeze"; and that they were wearing black uniforms, displaying gold badges, and bearing handguns). While the district court found these facts critical to the *de facto* police determination, the Fourth Circuit was not so swayed: "[A]bsent evidence indicating, for instance, that [the officers'] car, uniform, and badges were official police items used at the Government's behest . . . we are not persuaded that such items support the proposition that [the officers] were state actors." 591 F.3d at 688 n.8. Similarly here,

---

[11] As the saying goes, if it looks like a duck, walks like a duck, and quacks like a duck, it must be a duck.

there is no evidence that Mr. Johnson was wearing state-issued clothing. To the contrary, Mr. Johnson testified he was dressed "[b]asically [in] S.W.A.T. gear" with patches on the front and back of his shirt indicating he was an "SCSA officer," i.e., an employee of the South Carolina Security Agency, his private employer.

The overwhelming evidence makes it clear that Mr. Johnson made the arrest on his own, for the benefit of his private employer and its client, and without the knowledge or acquiescence of the Dorchester County Sheriff's Office. His search of Mayes resulted from a credible tip by a bystander who saw Mayes carrying a potentially dangerous and illegal handgun at a crowded racetrack and was neither encouraged nor participated in by the Dorchester County Sheriff's Office. Therefore, the constitutional concerns raised by Mayes are not implicated. See United States v. Kinney, 953 F.2d 863, 865 (4th Cir. 1992) ("The Fourth Amendment is directed exclusively at state action and evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.").[12]

---

[12] This holding is in accord with the numerous court decisions holding that actions taken by private security guards did not transform them into government agents. See, e.g., United States v. Shahid, 117 F.3d 322, 326 (7th Cir. 1997) (finding that mall security officers performed private rather than governmental functions because "[n]othing in the evidence at the suppression hearing suggests that the Marion County Sheriff's Department is able to control or induces decisions of mall security officers to stop and search persons on mall property"); United States v. Francoeur, 547 F.2d 891, 893-94 (5th Cir. 1977) (finding that security personnel at Disney World did not act as government officials); United States v. Harless, 464 F.2d 953, 956 (9th Cir. 1972) (finding no governmental action when a hotel security guard took possession of an attache case); State v. Santiago, 217 P.3d 89, 100 (N.M. 2009) ("[A]ny sins of the private security guards cannot be imputed to the state."); United States v. Lima, 424 A.2d 113, 118 (D.C. Ct. App. 1980) (en banc) ("Searches and seizures by private security employees have traditionally been viewed as those of a private citizen and consequently not subject to Fourth Amendment proscriptions."); Elizabeth E. Job, The Paradox of Private Policing, 95 J. Crim. L. & Criminology 49, 54 (2004) ("[T]he Supreme Court and the lower courts have repeatedly rejected claims that the federal constitutional constraints placed on public police should also apply to the private police.").

### 2. Whether Mr. Johnson Intended to Assist Law Enforcement or Had an Independent Motivation

The second factor to consider is "whether the private individual intended to assist law enforcement or had some other independent motivation." Jarrett, 338 F.3d at 34. Mr. Johnson's intention was to provide safety and security to those at the racetrack, which was the identical but completely independent intention of the Dorchester County Sheriff's Office. The Fourth Circuit has found that "even if the sole or paramount intent of . . . security officers" is to assist law enforcement, that intent does not transform a private action into a public one "absent a sufficient showing of Government knowledge and acquiescence under the first factor of the agency test." Day, 591 F.3d at 686 (internal quotation marks omitted). As discussed above, Mayes cannot establish that the government knew of and acquiesced in Mr. Johnson's conduct; therefore, he cannot establish that Mr. Johnson was acting as a government agent.

Even if the first factor were met, Mayes still cannot show that Mr. Johnson intended to assist law enforcement. Mr. Johnson's intention was to perform the duties required by his private employer. Cf. Shahid, 117 F.3d at 326 (finding that mall security officers performed private functions because there was "no reason to doubt that they acted to ensure the safety and security of the mall in order to further private purposes, such as satisfying their employer and the mall's retailers"); United States v. Koenig, 856 F.2d 843, 851 (7th Cir. 1988) (noting that the "happy coincidence" that both private citizens and police officers try to prevent crime "does not make a private actor an arm of the government"); see S.C. Jur. Private Det. § 6 ("[P]rivate security officers employed [in South Carolina] by a private security business have their duties imposed by contract."). To illustrate the independent motivations of Mr. Johnson and the Dorchester County

16

Sheriff's Office, a sheriff's deputy testified that he would leave the area in which private security guards assumed control so as to avoid "doubling up."  "[M]ore than the mere presence of a police officer is necessary to constitute the government action required to implicate Fourth Amendment concerns."  Kinney, 953 F.2d at 865.  For these reasons, Mayes cannot satisfy the second factor of the agency test.

In sum, because Mayes has failed to meet his burden of proving that an agency relationship existed between Mr. Johnson and the government, there was no unconstitutional governmental action taken by Mr. Johnson, and Mayes's motion to suppress the seizure of the gun and statements made to Mr. Johnson must be denied.

### B.  Whether Mr. Johnson's Actions Were Constitutional

The government alternatively argues that even if Mr. Johnson were a government actor, he did not violate Mayes's constitutional rights.

Police-citizen encounters that implicate the Fourth Amendment often fall into one of two categories.  First, police may engage in "brief investigatory stops," or Terry stops, if an officer "has a reasonable supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).  Second, police officers may effect full-scale searches or arrests when they have probable cause to believe a crime has been committed.  Probable cause exists if, given the totality of the circumstances, the officer "had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964).

In this case, Mr. Johnson had "more than an 'inchoate and unparticularized suspicion or 'hunch'''" that criminal activity was afoot.  Sokolow, 490 U.S. at 7 (quoting Terry, 392 U.S. at 27).  A tipster notified Mr. Johnson that he had seen a man drop a gun on the floor while using the bathroom.  The tipster remained next to Mr. Johnson and pointed out Mayes as he exited the bathroom, stating, "that's the guy that had the gun on him."  Mr. Johnson verified the tip by walking by Mayes and giving him a "little shoulder bump," which allowed Mr. Johnson to feel an automatic firearm concealed in Mayes's waistband.  It was not until this point that Mr. Johnson moved Mayes away from the bathroom area and restrained him.

Considering the circumstances known to Mr. Johnson at the time of the stop, including the corroborated tip and the exigencies of needing to protect the Easter Sunday crowd—including children—gathered near the bathroom, Mr. Johnson clearly had an objectively reasonable and sufficiently particularized suspicion that Mayes was engaged in criminal activity.  See United States v. Smith, 396 F.3d 579, 583 (4th Cir. 2005).  Moreover, based on his training and experience in searching for weapons at night clubs, Mr. Johnson reasonably concluded that Mayes was carrying an automatic in his waistband.  See id.  Finally, Mr. Johnson was also entitled to conduct a pat down for his own safety and the safety of others.  See United States v. Black, 525 F.3d 359, 366 (4th Cir. 2008).

Because there was a reasonable, articulable suspicion that criminal activity was afoot, Mr. Johnson did not violate Mayes's constitutional rights in performing a pat down.[13]  Therefore, the firearm was validly seized as the fruit of a constitutional search.

---

[13] Because Mr. Johnson conducted a constitutionally permissible Terry stop, the court need not determine whether he had probable cause to search Mayes.  Still, based on the corroborated tip, it

### C. Whether Statements Made by Mayes Must Be Suppressed

Finally, Mayes seeks to suppress statements made after the firearm was discovered.

The testimony given at the hearing shows that Mayes made statements both to Mr. Johnson and to a deputy from the Dorchester County Sheriff's Office prior to being read his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The warnings required by Miranda need only be given when a suspect is subject to a "custodial police interrogation." Id. at 439; see United States v. Martindale, 790 F.2d 1129, 1133 (4th Cir. 1986) ("*Miranda* is applicable only in cases where the defendant is in custody." (citation omitted)). The Miranda safeguards come into play when a person is "subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Here, because Mr. Johnson was not a state actor, the Fifth Amendment concerns raised by Mayes regarding his statements to Mr. Johnson are inapplicable. See Connelly, 479 U.S. at 170. Even if Mr. Johnson were a state actor, Mayes' unsolicited offer of money to Mr. Johnson so that Mr. Johnson would release him was not the result of any questioning "reasonably likely to elicit an incriminating response." Id. In addition, Miranda warnings are unnecessary before an officer may question a suspect during a Terry stop. See Day, 591 F.3d at 696 (Davis, J., dissenting in part and concurring in the judgment in part) (citing United States v. Leshuk, 65 F.3d 1105, 1108-09 (4th Cir. 1995)).

---

appears there was "a fair probably that contraband or evidence of a crime w[ould] be found," Illinois v. Gates, 462 U.S. 213, 238 (1983), so Mr. Johnson likely also had probable cause to effect a search of Mayes's person.

19

Mayes's statements to the sheriff's deputy while in handcuffs and prior to being read his Miranda rights present a thornier issue. When Mayes was delivered to the sheriff's deputies, he was placed in a deputy's handcuffs and taken into custody. During this time, and prior to being issued a Miranda warning, Mayes continued to state his reasons for carrying a gun. However, there is no indication that these statements were made as a result of any actual questioning by the sheriff's deputy; instead, the testimony indicates they were being made to Mr. Johnson while Mr. Johnson was handing over Mayes to the deputies. Therefore, the statements need not be suppressed because there was no interrogation. See Miranda, 384 U.S. at 444 (defining "custodial interrogation" as "*questioning* initiated by law enforcement officers after a person has been taken into custody" (emphasis added)).

## III.  CONCLUSION

For the foregoing reasons, the court **DENIES** defendant's motion to suppress.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 24, 2013**
**Charleston, South Carolina**